# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| CAROLYN A. CAMPBELL | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:03-0679** |
| v. | ) | **Judge Nixon / Knowles** |
| | ) | |
| JO ANNE BARNHART, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff was not disabled and denying Plaintiff Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided under the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's "Motion for Judgement [*sic*]."[1]  Docket Entry No. 13.  Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed.  Docket Entry No. 22.  Plaintiff has filed "A [M]otion for [D]efendant's [R]esponse to be [D]ismissed," which states in its entirety as follows:

> The reason is because the job at vocational rehabilitation there was [*sic*] a very bad experience.  I was doing very hard labor and reinjured my left arm.  I told the supervisor and she sent me home. I was also fired, after I told the supervisor that I had two sist [*sic*]

---

[1]Plaintiff is proceeding pro se.

1

on my left hand at my previous job. I don't believe that I could perform significant number of jobs, because of my dislexia [*sic*], spine damage, and my comprehendsion [*sic*] skills. My previous job was at Urban Housing Solutions.

Docket Entry No. 23.

For the reasons stated below, the undersigned recommends that Plaintiff's "Motion for Judgement [*sic*]" be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I. INTRODUCTION

Plaintiff filed her applications for DIB and SSI on June 18, 2001, alleging that she had been disabled since February 13, 1997,[2] due to three herniated discs in her back and left leg problems. Docket Entry No. 10, Attachment ("TR"), TR 15; 175-177; 184; 275. Plaintiff's applications were denied both initially (TR 128-129) and upon reconsideration (TR 130-131).[3] Plaintiff subsequently requested (TR 156-157) and received (TR 28-33) a hearing. Plaintiff's hearing was conducted on June 7, 2002, by Administrative Law Judge ("ALJ") Mack H. Cherry. TR 34. Plaintiff, Plaintiff's niece, Tusha Bass, medical expert ("ME"), Rebecca Hansmann, and vocational expert ("VE"), Jane Brenton, appeared and testified. TR 42-106.

On January 31, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that Plaintiff was not disabled within the meaning of the Social Security Act and Regulations. TR 15-27. Specifically, the ALJ made the following findings of fact:

> 1. The claimant met the disability insured status requirements of the Act on the amended onset date of October 31, 2000,

_____

[2]Plaintiff later amended her onset date to October 31, 2000. TR 275.

[3]The SSI procedural information is "not available for inclusion" in the record (TR 5), and the information in the body of this report and recommendation was gathered from the ALJ's "procedural history and issues" (TR 15).

2

and continued to meet them through December 31, 2001, but not thereafter.

2. The claimant has not engaged in substantial activity since that date.

3. The medical evidence establishes that the claimant has "severe" impairments, including chronic lumbar strain, a somatization disorder, learning disorders, and a personality disorder, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No 4.

4. The subjective complaints are not persuasive for the reasons discussed above.

5. The claimant has the residual functional capacity to perform a limited range of light work with limitations, including psychological, described more fully above.

6. The claimant is unable to perform her past relevant work.

7. The claimant is 47 years old, which is defined as a younger individual.

8. The claimant has a limited education, but reads at the second or third grade level.

9. The claimant does not have any acquired work skills, which are transferable to the skilled or semiskilled work functions of other work.

10. Based on an exertional capacity for light work and the claimant's age, education, and work experience, section 404.1569 of Regulations No. 4 and section 416. 969 of Regulations No. 16 and Rules 202.16, 202.17, or 202.18, Table No. 2, of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

11. Although claimant's additional non-exertional limitations do not allow her to perform the full range of light work, using the above cited rules as a framework for decision-making and based on the vocational expert's testimony, there are a significant number of jobs in the national

3

economy that she could perform. Examples and numbers of such jobs are cited above.

12.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

TR 26-27.

On March 21, 2003, Plaintiff timely filed a request for review of the hearing decision.

TR 10-11. On May 20, 2003, the Appeals Council issued a letter declining to review the case

(TR 7-8), thereby rendering the decision of the ALJ the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. §§ 405(g)

and 1383(c)(3). If the Commissioner's findings are supported by substantial evidence, based

upon the record as a whole, then these findings are conclusive. *Id.*

## II. REVIEW OF THE RECORD

### A. Medical Evidence

On January 16, 1995, Dr. Richard Pinson treated Plaintiff at the Baptist Hospital

Emergency Room. TR 483-485. Dr. Pinson stated that Plaintiff "hurt her back lifting at work

about five days ago," and was experiencing "[p]ain on the left sacroiliac region radiating to the

left gluteus but not into the leg." TR 483. Upon physical examination, Dr. Pinson noted that

Plaintiff had "limited bending and turning with slight pain" and "[n]o percussion tenderness,

localized tenderness." *Id.* Dr. Pinson's clinical impression was that Plaintiff had "[b]ack strain,"

and that there was "[n]o evidence of herniated lumbar disk or other significant traumatic injury

such as fracture, dislocation or other pathologic process." *Id.* Dr. Pinson instructed Plaintiff to

perform "no lifting over 10 pounds and no bending for about five days." TR 483-484. Dr.

Pinson noted, "A plain lumbosacral spine film is within normal limits... ." TR 483.

4

On April 17, 1995, Ms. Tracy Walker conducted Plaintiff's "Physical Therapy Initial Evaluation" for treatment of her back pain. TR 339-340. Ms. Walker indicated that Plaintiff reported numbness in her left foot, and "sharp pain" in her lower back. TR 335. Ms. Walker reported that, with regard to her back pain, Plaintiff "refused to verbalize what had happened," but acknowledged that her back injury occurred on January 13, 1995, "while lifting a heavy box." TR 339. Plaintiff provided Ms. Walker with the results of a "CT done in January" that stated she had a "bulging disc [*sic*] in L2-3, L3-4, and L4-5," "hypertrophy in the facets on all levels above," and "some narrowing of the neuro opening mainly in between L3-4." *Id.* Ms. Walker noted that Plaintiff had undergone x-rays, but that she did not bring her reports to the evaluation. *Id.* Ms. Walker recorded Plaintiff's report that heat and lying on her right side alleviated her pain, but that standing and sitting increased her pain. TR 336; 339. Ms. Walker found that Plaintiff was working "as a security guard at the Archive Library," and that this job permitted her to "sit down and lie down occasionally during work." TR 339. Ms. Walker noted Plaintiff's report that she was taking "Naproxen" and "Methocarbomal," that she was "emotionally" a "0 on a scale of 0/10," and that her pain was "6/10." TR 338-339.

Upon physical examination, Ms. Walker found that Plaintiff had "[i]ncreased tenderness in lumbar area bilaterally," and that her "[s]ensation" was "[i]ntact to light touch." TR 339. Ms. Walker assessed Plaintiff's range of motion as follows: "Trunk ROM decreased by 1/4 range in lumbar flexion. All other trunk movements are WFL. LE flexibility in the left. Decreased hamstring length, left is decreased greater than the right side. All other motions WFL." *Id.* Ms. Walker assessed Plaintiff's strength as: "Right LE WFL, left quad strength 4/5, hamstring 4/5, hip flexors 4+/5, all others WFL." *Id.* Ms. Walker noted that Plaintiff was experiencing

5

increased pain in her lower back, decreased "ROM" in her trunk, decreased flexibility in her hamstrings, and was "[d]ependent with HEP." TR 340. Ms. Walker stated that Plaintiff's "rehab potential" was "good." *Id.* On April 21, 1995 and April 25, 1995, Plaintiff attended her physical therapy appointments (TR 341), but on May 16, 1995, her physical therapy record indicated that: "[Plaintiff] failed to show for previously scheduled appoints. States that she is feeling better"(TR 333).

On September 1, 1995, Plaintiff was evaluated at Metropolitan Nashville General Hospital for a complaint of lower back pain "radiating down" her left leg, which "worsened [with] prolonged standing."[4] TR 346. Plaintiff stated that a previous CT scan revealed three "bulging disks." *Id.* Plaintiff's instructions included taking a "muscle relaxant," getting "bedrest," and keeping an "appt [with] M.D. on Tuesday." *Id.*

On September 27, 1995, Dr. M. Robert Weiss wrote a letter to Ms. Tammy Graham of "K M Services," concerning his treatment of Plaintiff for the pain in her back and left leg. TR 351-352. Dr. Weiss indicated that Plaintiff had injured her back when she was "lifting a case of oil for K-Mart, where she was stocking shelves." TR 351. He stated, "Since then, she has continued working but has had numerous complaints and persistent symptoms." *Id.* Upon physical examination, Dr. Weiss found that Plaintiff "would not bend forward at the waist at all," but "did extend and laterally flex without any difficulty." *Id.* He also found that her "[a]ctive and passive range of motion in all major joints in the extremities is normal," and that, "Sensorimotor examination reveals some patchy numbness, alternating from leg to leg." *Id.* Dr. Weiss further noted that Plaintiff's CT scan indicated that she had a "protrusion at L3-4 and L4-

---

[4]Some portions of this record, including the signature, are illegible. TR 346.

5," and he stated, "At L4-5, actually, it appears there may be a left lateralizing disc herniation." TR 352. Dr. Weiss suggested that Plaintiff undergo a myelogram / post myelogram CT scan "to be absolutely certain that this woman does not have a surgically correctable lesion." *Id.*

On October 2, 1995, Dr. Weiss stated that Plaintiff "ultimately was unwilling to undergo either an MRI or a lumbar myelogram," but that he "obtained a CT scan as at least one reasonable option to obtain an imaging study of her lumbar spine." TR 350. Dr. Weiss found that the CT scan was "an entirely normal study, not surprisingly."[5] *Id.* Dr. Weiss concluded that Plaintiff had reached her "maximum medical improvement." *Id.*

On October 20, 1995, Dr. Weiss indicated that Plaintiff had "called repeatedly," and had "been abusive with the secretarial staff." TR 349. He stated: "I do not feel based on her discussion with me today, where she also became somewhat inappropriate, that I can continue to treat this woman. Presently I do not think she has a life threatening or emergent problem." *Id.* He also noted that Plaintiff had requested a narcotic pain medication, Toradol. *Id.* On November 1, 1995, Dr. Weiss wrote a letter to Mr. Charles Abbott, stating that he did not think that Plaintiff needed "psychiatric or psychologic treatment." TR 348.

From June 14, 1996 to June 28, 1996, Dr. Joe W. Ellen treated Plaintiff for her complaint of back pain. TR 355-357. On June 14, 1996, Dr. Ellen's physical examination of Plaintiff revealed that Plaintiff had paresthesia in the area of her left L4, L5, and S-1, as well as decreased deep tendon reflexes in her left patellar and achilles tendons. TR 356. Dr. Ellen concluded that Plaintiff had "general osteoarthritis w/ degenerative disc dis. L-5/S1." TR 355.

_____

[5]Given the conclusions Dr. Weiss reached in his letter dated September 27, 1995, discussed above, concerning her earlier CT scan, it is unclear why this CT scan was "not surprisingly" "normal."

Case 3:03-cv-00679   Document 34   Filed 04/18/06   Page 7 of 45 PageID #: 9

On August 23, 1996, Dr. Winston H. Griner completed a "Medical Source Statement To Do Work-Related Activities (Physical)" form for Plaintiff. TR 480-482. Dr. Griner indicated that Plaintiff could occasionally lift and/or carry less than 20 pounds, frequently lift and/or carry less than 10 pounds, and stand, walk, and/or sit for 2 hours total (and for 30 minutes without interruption) out of an 8-hour workday. TR 480-481. Additionally, Dr. Griner determined that Plaintiff could never climb, stoop, kneel, or crawl, but could occasionally balance or crouch. *Id.* Dr. Griner stated that Plaintiff's impairments affected her ability to reach and push and/or pull. *Id.* Dr. Griner found that Plaintiff's impairment also imposed environmental restrictions, including limitations on exposure to heights, moving machinery, humidity, and vibration. *Id.* Dr. Griner indicated that Plaintiff also manifested "[d]epression 2 to gain." TR 482.

On February 17, 1997, Dr. E.I. Howell, Jr. treated Plaintiff for her back pain. TR 512-513. Dr. Howell recounted Plaintiff's assertion that she injured her back while working as a cashier at K-Mart. TR 512. Dr. Howell noted that Plaintiff had had a CT scan which revealed "degenerative disc disease with disc bulging and at L2, 3, and 4," and also noted that Plaintiff had refused surgery, despite Dr. Weiss' recommendation. *Id.* Dr. Howell recorded Plaintiff's account that she did not receive treatment in 1996, and that she continued to experience "persistent back pain with radiation of pain down the left leg with numbness and weakness and, in addition, has noted pain in the shoulder, pain in the neck, and numbness in the left arm." *Id.* Dr. Howell stated that Plaintiff was "[p]ositive for anxiety and depression," that she was "not sleeping at night," and that she had hemorrhoids. *Id.* Upon physical examination, Dr. Howell found that Plaintiff had a "full range of motion of her neck," "patchy sensory loss of the left arm," and "diminished range of motion in her back." *Id.* Dr. Howell noted that Plaintiff "refuses

to walk on either heels or toes on the left foot, " and he observed: "She has a generalized patchy sensory loss of the entire left leg.  Her reflexes are active."  TR 513.[6]  Dr. Howell reviewed Plaintiff's MRI dated September 8, 1995, which revealed a "left lateral disc herniation at L4-5."  *Id.*  Dr. Howell indicated that Dr. Weiss had recommended surgery, despite the fact that he was a "very conservative neurosurgeon."  *Id.*  Dr. Howell concluded that Plaintiff had "an impairment to the body as a whole of 10 percent, based on the AMA Guidelines, injury method DRE category III."  *Id.*  Dr. Howell also noted that Plaintiff had "[s]ignificant clinical presentation indicating depression and/or anxiety."  *Id.*

On February 28, 1997, Dr. Howell wrote a letter to Ms. Tammy Graham at "K-Mart Services," stating that he had conducted an evaluation of Plaintiff using "very limited medical records."  TR 360.

On April 29, 1997, Dr. Griner treated Plaintiff for her complaint of back pain.  TR 514-515.  Dr. Griner noted that Plaintiff reported that her back injury had occurred at K-Mart, that her pain was "getting progressively worse," and that she had "weakness in the leg."  Tr 514.  Dr. Griner indicated that Plaintiff rated her pain as "8/10 on the analog pain scale," that she had "increased pain with activities," and that she received "some relief with bracing."  *Id.*  Dr. Griner observed that Plaintiff was "obviously very depressed and crying throughout the exam," and that she walked "with a limp on the left side and complains of pain in the left lower extremity with weight bearing."  *Id.*  Dr. Griner found that Plaintiff had "marked decreased range of motion of the lumbar spine with pain" and "superficial tenderness on palpation."  *Id.*  Upon review of Plaintiff's prior CT and MRI scans, Dr. Griner found that Plaintiff had a "left lateral disc

---

[6]There is a duplicate of TR 513 at TR 359.

9

herniation at the L4-5 level" which "probably does affect the L4 nerve root." TR 515. He further observed, "There is also some mild displacement of the left L5 nerve root." *Id.* Dr. Griner's impression was that Plaintiff had "[l]umbar radiculopathy, left L5, probably also a component of L4 with her diminished knee reflex," and he opined, "This is most likely due to a posterior and lateral left-sided L4-5 disc herniation with her imaging studies being a year and half old." *Id.* Dr. Griner's second impression was: "[d]epression." *Id.* Dr. Griner recommended that Plaintiff should "see a psychiatrist to evaluate the depression," undergo a "work-up to rule out metabolic neuropathic sources for her unusually high level of pain," and obtain "high quality MRI with MRI cuts parallel to the disc space." *Id.*

On June 23, 1997, Dr. James R. McFerrin evaluated Plaintiff on behalf of the Tennessee Disability Determination Services ("DDS"). TR 474-476. Dr. McFerrin found that Plaintiff's "affect was peculiar and she stayed on the telephone in the lobby delaying my examination of her for several minutes." TR 474. Dr. McFerrin also found that Plaintiff had "been diagnosed with a bulging lumbar disc which may or may not have herniated," but that she had "refused surgery." *Id.* Dr. McFerrin also indicated that Plaintiff reported taking sleeping pills and pain medication, but that she did not bring her medication with her to the evaluation as instructed. *Id.* Dr. McFerrin stated that Plaintiff had no money, and "refused her worker's compensation claim." *Id.* Dr. McFerrin also stated that Plaintiff's medical records revealed that she had taken medications such as Cimetidine and Darvocet. *Id.* Dr. McFerrin recounted Plaintiff's report that she had injured herself on January 13, 1995, and that she had tried to work until May 1996. TR 475. With regard to Plaintiff's "mental status," Dr. McFerrin stated that Plaintiff had "average to low average intellect," that she "cries or avoids eye contact," that she was "evasive with all of

10

her answers," and that she was "highly somatic." *Id.* Dr. McFerrin indicated that Plaintiff refused to take a memory test, would not "guess the name of the president or vice-president," and would not "attempt any computations in her head." *Id.* Dr. McFerrin's diagnoses of Plaintiff were: "Axis I: 307.89, pain disorder associated with both psychological factors and a general medical condition. Axis II: 301.9, personality disorder NOS with histrionic and avoidant features. Axis III: History of bulging lumbar disc and back pain. Axis IV: Moderate due to unemployment and chronic back pain. Axis V: GAF 65." *Id.* Dr. McFerrin concluded that Plaintiff's "[d]aily activities are mildly restricted due to back pain." TR 476.

Also on June 23, 1997, Dr. McFerrin completed a "Medical Source Statement to Do Work-Related Activities (Mental)" form for Plaintiff. TR 477-479. Dr. McFerrin found that Plaintiff manifested "[g]ood" abilities to: "[f]ollow work rules," "[r]elate to co-workers," "[d]eal with public," "[u]se judgment," "[i]nteract with supervisors," "[f]unction independently," and "[m]aintain attention, concentration." TR 477. Dr. McFerrin also found that Plaintiff had a "[f]air" ability to "[d]eal with work stresses." *Id.* Dr. McFerrin indicated that Plaintiff was "preoccupied w/pain" and had "poor stress tolerance." *Id.* With regard to Plaintiff's abilities to "adjust to a job," Dr. McFerrin indicated that Plaintiff's ability to follow "[s]imple job instructions" was "[u]nlimited/[v]ery good"; her ability to follow "[d]etailed, but not complex job instructions" was "[g]ood"; and her ability to follow "[c]omplex job instructions" was "[f]air." TR 478. Dr. McFerrin assessed Plaintiff's ability to make "personal-social adjustments," finding that she had "[g]ood" abilities to "[m]aintain personal appearance" and "[b]ehave in an emotionally stable manner," and had "[f]air" abilities to "[r]elate predictably in social situations" and "[d]emonstrate reliability." *Id.*

11

On October 14, 1999, an "Analysis by DDS Medical Consultant" indicated that Plaintiff's medical records were "[t]echnically insufficient" "to determine impairment severity."[7] TR 361.

On April 29, 2000, Dr. Plummer[8] treated Plaintiff at Columbia Hospital Emergency Department.[9] TR 363. Dr. Plummer diagnosed Plaintiff with "[f]racture lateral malleolus" of the ankle, and instructed Plaintiff to apply ice to her foot and to "raise it above [her] heart to reduce swelling." *Id.*

On May 2, 2000, Plaintiff sought treatment for her fractured left ankle at the "Primary Care and Pain Relief Center."[10] TR 384. Plaintiff's lower back pain and decreased range of motion were also noted, and her treatment plan included an EEG.[11] *Id.*

On August 31, 2000, Dr. Griner evaluated Plaintiff for pain in her left ankle and swelling in her right ankle. TR 381. Dr. Griner referred Plaintiff to Dr. Weaver, an orthopaedic specialist.[12] *Id.*

On October 2, 2000, Dr. John C. McInnis wrote a letter to the Tennessee Department of

---

[7]The signature and stamp on the record are illegible. TR 361.

[8]Dr. Plummer's first name is unknown.

[9]There is a duplicate copy of these records at TR 362.

[10]The signature on this record is illegible. TR 384. The record contains numerous evaluations from the same treatment facility, all of which have illegible signatures. TR 371; 373-374; 379-380; 382-386. These records date from March 8, 2000, to September 11, 2001, and each notes Plaintiff's complaint of back pain. *Id.*

[11]Many of the treatment notes are illegible, and there is no additional information available concerning laboratory reports, diagnoses, or treatment. TR 384.

[12]Dr. Weaver's first name is unknown. TR 381. Additionally, there is nothing in the record to indicate that Plaintiff ever saw Dr. Weaver.

12

Human Services ("DHS"), concerning Plaintiff's impairments. TR 364. Dr. McInnis recorded Plaintiff's complaints of pain in her "low back, left buttock, and left leg." *Id.* Dr. McInnis stated that Plaintiff had had "several epidural steroid injections" and that her pain was "aggravated by bending, twisting or lifting." *Id.* Dr. McInnis recounted Plaintiff's ankle injury in April 2000, noting that she had "suffered a fracture of her left ankle," but that she had not undergone surgery. *Id.* Upon physical examination, Dr. McInnis found that Plaintiff had "stocking glove type hypoesthesia of her left leg and some giving way on testing the ankle dorsiflexors and plantar flexors of her left ankle," and "some mild swelling over the lateral malleolus and some tenderness over the lateral melleolus." TR 364-365. Dr. McInnis indicated that Plaintiff's lumbar spine x-rays were normal. TR 365. Dr. McInnis diagnosed Plaintiff with "[c]hronic low back strain" and "[p]revious nondisplaced fracture lateral malleolus left ankle." *Id.* Dr. McInnis recommended that Plaintiff "should have some restrictions as far as heavy lifting is concerned." *Id.* He opined that Plaintiff "could probably lift up to 25 pounds," but that she should "avoid frequent bending and stooping." *Id.* He further opined, "I would think that she could walk or stand four hours per day," but recommended that she "should avoid walking on uneven ground." *Id.*

On October 3, 2000, Plaintiff was evaluated using a "Physical Capacities Worksheet."[13] TR 366-367. Plaintiff was assessed as being able to occasionally lift and/or carry 25 pounds, frequently lift and/or carry 10 pounds, "stand daily (with breaks every two hours)" for 4 hours, "sit daily (with breaks)" for 8 hours, and "walk daily" for "one quarter mile." TR 366-367. Plaintiff's Physical Capacities Worksheet indicated that she had "stooping" limitations. TR 366.

---

[13]The signature on the form is illegible. TR 367.

13

On November 27, 2000, Ms. Susan Forbis wrote a letter to Dr. Griner, indicating that Dr. Griner had referred Plaintiff for treatment at STAR Physical Therapy.  TR 368.

On December 1, 2000, Dr. Griner wrote a letter to the "Medical Director" at "Accident and Injury Health Services."  TR 378.  Dr. Griner stated that Plaintiff had been a patient since February 28, 1994, for treatment of her "cervical pain and spine damage."  *Id.*  Dr. Griner also stated that Plaintiff was taking "[l]oratab [*sic*], keflex, colace methacarbamol, hydrocodone-hpap and triggers shots."[14]  *Id.*

On May 29, 2001, Dr. Griner ordered laboratory reports, including a urinalysis, which returned "negative" results.  TR 375-377.

On August 15, 2001, Plaintiff was evaluated using a "food stamp request for medical information" form, and was found "unable to work due to LBP."[15]  TR 372.

On September 11, 2001, Plaintiff was again evaluated using a "food stamp request for medical information" form, and was found "unable to work due to LBP [with] radiculopathy."[16]  TR 370.

On August 9, 2001, Dr. William O'Brien evaluated Plaintiff on behalf of the Tennessee DDS.  TR 387-390.  Dr. O'Brien noted that Plaintiff alleged that her physical disabilities and learning disabilities prevented her from obtaining "gainful employment."  TR 387.  Dr. O'Brien also stated that Plaintiff relied upon "financial contributions that she receives from others" to

---

[14]There is another letter in the Record, dated May 29, 2001, signed by Dr. Tahnya, that is essentially a duplicate of this letter.  *See* TR 369.

[15]The signature on this form is illegible.  TR 372.  The conditions listed after "LBP" are also illegible.  *Id.*

[16]The signature on this form is illegible.  TR 370.

support herself.  *Id.*  Dr. O'Brien noted that Plaintiff was left-handed.  *Id.*  Dr. O'Brien found

that Plaintiff's medical history included "chronic unspecified cervical pain and spine damage,

due to a work-related injury" and "high blood pressure, [and] arthritis (type unknown)."  TR 388.

Dr. O'Brien recorded Plaintiff's report that she had earned her "low average grades" in school by

cheating.  *Id.*  Dr. O'Brien also noted that Plaintiff had obtained a "certificate of attendance"

from Cohn Adult High School in 1991, and that she "completed book 4 on the Challenger Adult

Reading Theory."  *Id.*  With regard to Plaintiff's daily activities, Dr. O'Brien recounted

Plaintiff's report that she was "physically unable to carry out any type of household related

tasks" for 2 days out of the week. TR 389.  Dr. O'Brien stated that Plaintiff reported that she

could wash dishes, prepare meals, purchase her own food and clothing items independently, do

her own laundry, drive short distances, and vacuum or sweep once each month.  *Id.*  Dr. O'Brien

evaluated Plaintiff, finding that she had a Full Scale IQ of 69, which indicated that she was in the

"[e]xtremely [l]ow range."  *Id.*  Dr. O'Brien's diagnostic impressions were: "Axis I: Reading

Disorder.  Disorder of Written Expression.  Axis II: Borderline Intellectual Functioning."  TR

390.  Dr. O'Brien determined that Plaintiff's "psychological capacity" to obtain gainful

employment was as follows:

> [Plaintiff] does not appear significantly impaired in her ability to
> sustain concentration and peristence, remember simple
> instructions, travel independently, make plans independently of
> others, socially interact in an appropriate manner, maintain basic
> standards of neatness/cleanliness, be aware of normal hazards in
> the work/household setting, work with others in the work force
> (based on claimant's past self-reported history), accept oral
> instructions and criticism or in her ability to manage her funds.

TR 390.

On August 17, 2001, Dr. Bruce A. Davis examined Plaintiff through "Corporate Services

15

Inc." TR 391-393. Dr. Davis found that Plaintiff was a "poor historian" and listed her complaint as "musculoskeletal – work injury 1995 with residual complaints," which included neck and back pain. TR 391. Dr. Davis indicated that Plaintiff's pain treatment included "rest, massage/vibration, heat/ice, back brace, medications (oral, injection), and physicians visits." *Id.* Dr. Davis' "review of systems" revealed that Plaintiff's other conditions, besides back and neck pain, included "shortness of breath"; "poor appetite, abdominal pain, indigestion, bowel problems"; and "anxiety/depression, sleep difficulty." *Id.* Upon physical examination, Dr. Davis observed that Plaintiff had "[s]low changing position on/off exam table; posterior/lateral neck pain with slow but full motion in the neck" and "mild tandem unsteadiness across exam room without assistance." TR 392. Dr. Davis referenced an x-ray of Plaintiff's lumbar spine, which revealed "normal disc spaces." TR 393-394.

Dr. Davis diagnosed Plaintiff with: "[c]lass 1 [o]besity (body mass index > 30 kg/m2)"; "[m]usculoskeletal disease: work injury with cervical/lumbar strain"; and "[p]sych: anxiety/depression, incomplete education." TR 393. Dr. Davis concluded that Plaintiff could occasionally lift and/or carry a maximum of 20 pounds, frequently lift and/or carry a maximum of 10 pounds, stand and/or walk for 6 hours out of an 8-hour workday, and sit for 8 hours out of an 8-hour workday. *Id.* Dr. Davis noted that Plaintiff's postural limitations were "limited bending, squatting"; and her "physical/environmental limitations" were "limited heat/humidity, climbing/heights." *Id.*

On September 12, 2001, Dr. Misra completed a Residual Functional Capacity Assessment ("RFC") (Physical) form for Plaintiff.[17] TR 395-402. Dr. Misra found that Plaintiff

---

[17]Dr. Misra's first name is illegible. TR 402.

16

could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand, walk, and sit for "about 6 hours in an 8-hour workday," and push and/or pull without limitation. TR 396. Dr. Misra indicated that Plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl, and that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. TR 397-399.

Also on September 12, 2001, Mr. Kourany completed a Psychiatric Review Technique Form ("PRTF") for Plaintiff.[18] TR 403-416. Mr. Kourany found that Plaintiff had "[a]ffective [d]isorders" from an unlisted impairment (TR 406), and "[m]ental [r]etardation" from "BIF" (TR 407).[19] Mr. Kourany indicated that Plaintiff had a "[m]ild" degree of limitation with regard to her "Restriction of Activities of Daily Living," and a "[m]oderate" degree of limitation with regard to her "Difficulties in Maintaining Social Functioning" and "Difficulties in Maintaining Concentration, Persistence, or Pace." TR 413.

On September 12, 2001, Mr. Kourany additionally completed a "Mental" RFC form for Plaintiff. TR 417-420. Mr. Kourany found that Plaintiff was "moderately limited" in her abilities to "maintain attention and concentration for extended periods"; "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; "interact appropriately with the general public"; "accept instructions and respond appropriately to criticism from supervisors"; and "set realistic goals or make plans independently of others." TR 417-418. Dr. Kourany found that Plaintiff was "markedly limited" in her abilities to

---

[18]Mr. Kourany's first name and title are unclear. TR 403.

[19]Mr. Kourany's handwritten note about the unlisted impairment is illegible. TR 406.

"understand and remember detailed instructions" and "carry out detailed instructions."[20]  TR 417-418.

On October 9, 2001, Dr. Ray Hargreaves wrote a letter to Dr. Alvin Brown concerning Plaintiff's "left posterior head pain."  TR 541-542.  Dr. Hargreaves stated that Plaintiff's CT scan indicated no "obvious abnormality."  TR 541.  Dr. Hargreaves suggested that Plaintiff "reestablish a relationship" with her previous neurologist.  *Id.*

On October 31, 2001, Dr. Judith Kaas Weiss conducted a psychological evaluation of Plaintiff.  TR 457-467.  Dr. Weiss stated that Plaintiff's "receptive and expressive language disorder were prominent," and that she "had difficulty comprehending questions and directions."  TR 457.  Dr. Weiss also noted that Plaintiff no longer lived in "Section 8 housing," and that she had no living arrangements as of November 1, 2001.  *Id.*  Dr. Weiss indicated that Plaintiff was not "rude or hostile, as reported by other professionals," and that "test results should be considered an accurate estimate of her current level of functioning."  *Id.*  Dr. Weiss recorded Plaintiff's back injury from 1995, and her "Workers Compensation settlement in 1997."  TR 458.  Dr. Weiss also indicated that Plaintiff reported that she had weighed 270 pounds at one time, and that she had lost 70 pounds to avoid back surgery.  *Id.*  Dr. Weiss recorded that Plaintiff's "spinal injury has been subsequently substantiated" by several physicians.  *Id.*  Dr. Weiss documented Plaintiff's difficulty in relating to various physicians, including Dr. Robert Weiss, Dr. Everette Howell, and Dr. James McFerrin, and to DDS evaluator Mary Ann Kennedy.  TR 458-460.  Dr. Weiss assessed Plaintiff's "mental status," noting that her "[a]ffect was flat" and that her "[a]nswers to questions were often tangential."  TR 461.  Dr. Weiss also found that Plaintiff's

---

[20]The record contains a "Mental Assessment" worksheet that is unsigned and undated. TR 468-469.

18

"immediate memory" was "impaired," and that her "[r]ecent memory" was "adequate." *Id.* Dr. Weiss indicated that Plaintiff was "depressed, anxious, and organically impaired," and had a "significant language disorder/learning disability." TR 462. With regard to Plaintiff's daily activities, Dr. Weiss stated that Plaintiff reported awakening at four o'clock in the morning and taking the bus to school, but missing school once per week "as a function of fatigue."[21] TR 463. Dr. Weiss also stated that Plaintiff was "independent in her activities of daily living; however, on some days she is in too much pain to do anything. She can no longer care for others. She cannot carry anything and cannot do her laundry. She added that if she avoids physical activities she feels better." *Id.* Dr. Weiss indicated that Plaintiff's "eating habits have changed since her loss of income." *Id.* With regard to her "ability to relate to others," Dr. Weiss stated that Plaintiff did not like being around persons who were "hostile, judgmental and upset," and that she "prefers to be alone and does not believe that she [could] work comfortably in a job that requires meeting the public." TR 464.

Dr. Weiss' "medical assessment" of Plaintiff was that she met the listings for "[o]rganic [m]ental [d]isorders"; "[s]chizophrenic, [p]aranoid and [o]ther [p]sychotic [d]isorders"; "[a]ffective [d]isorders"; and "[a]nxiety-[r]elated [d]isorders." TR 466. Dr. Weiss found that Plaintiff was "experiencing marked restrictions of daily living; extreme difficulties in maintaining social functioning; [and] marked difficulties in maintaining concentration, persistence, and/or pace." TR 467. Dr. Weiss diagnosed Plaintiff with: "Axis I: 315.31 Mixed Receptive-Expressive Language Disorder, 315.9 Learning Disorder NOS, 294.8 Dementia NOS, 295.30 Schizophrenia, Paranoid Type, 295.31[,] 296.31 (Congruent), 300.01 Panic Disorder

---

[21]Dr. Weiss noted that Plaintiff was participating in a "school program" and an "illiteracy program." TR 461.

19

without (reported) agoraphobia" and "Axis III: Back injury with subsequent disc disease." *Id.*

On November 26, 2001, Dr. Andani S. Prakash treated Plaintiff for "pain in the neck and shoulder area radiating to both arms and also numbness and tingling sensations in both hands, the left side being more severe than the right side." TR 530. Dr. Prakash performed "nerve conduction studies" and "electromyographic studies" on Plaintiff. TR 530-531.[22] Dr. Prakash found that Plaintiff's "distal motor latencies, amplitude of evoked responses, and conduction velocities of the Right and Left Median Nerves were normal." TR 531. Dr. Prakash also found all other studies to be "normal," except for the "Bilateral Abductor Pollicis Brevis Muscles which were decreased and more polyphasic potentials were seen." *Id.* Dr. Prakash concluded that Plaintiff had "bilateral carpal tunnel syndrome involving sensory fibers only without any evidence of denervation/Neuropraxia type." TR 532.

On January 8, 2002, Dr. James S. Walker completed a Psychiatric Review Technique form for Plaintiff. TR 421-433. Dr. Walker found that Plaintiff had "[a]ffective [d]isorders" evidenced by her "mood complaints, histrionic and somatoform tendencies." TR 424. Dr. Walker indicated that Plaintiff had a "[m]ild" degree of limitation with regard to her "Restriction of Activities of Daily Living," "Difficulties in Maintaining Social Functioning," and "Difficulties in Maintaining Concentration, Persistence, or Pace." TR 431. Dr. Walker referenced (TR 433) his findings from a "Drummond and Dennard Analysis Sheet" (TR 434-435). Dr. Walker used this analysis to determine that Plaintiff had "continued histrionic behavior"; that she was "anxious" and "highly somatic"; and that her "borderline IQ estimated by Dr. O'Brien" was "clearly invalid." TR 434. Dr. Walker concluded that there was "no

---

[22]The record contains nerve conduction studies from November 9, 2001. TR 534-538.

evidence of a significant deterioration in this patient's mental condition as compared to CPD." *Id.* Dr. Walker also indicated that he "carefully reviewed" Dr. Weiss' report, but gave many reasons for why he did not agree with Dr. Weiss, including his contention that Dr. Weiss "failed to address the potential impact of poor effort or embellishment."[23] TR 434-435.

On January 12, 2002, Dr. George W. Bounds completed a Physical RFC form for Plaintiff. TR 438-445. Dr. Bounds found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk and sit for "about 6 hours in an 8-hour workday," and push and/or pull without limitation. TR 439. Dr. Bounds indicated that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl, and that Plaintiff had no manipulative, visual, communicative, or environmental limitations.[24] TR 440-442.

On June 6, 2002, Dr. Hansmann completed a Psychiatric Review Technique Form for Plaintiff. TR 546-556. Dr. Hansmann found that Plaintiff suffered from: "Organic Mental Disorders"; "Schizophrenic, Paranoid and other Psychotic Disorders"; "Affective Disorders"; "Mental Retardation and Autism"; "Anxiety Related Disorders"; "Somatoform Disorders"; and "Personality Disorders." TR 546-552. Dr. Hansmann indicated that Plaintiff had a "[m]oderate" degree of limitation with regard to her "Restriction of Activities of Daily Living," and a "[m]arked" degree of limitations with regard to her "Difficulties in Maintaining Social Functioning." TR 553. Dr. Hansmann stated that Plaintiff "[o]ften" experienced "Deficiencies

---

[23]Dr. Weiss subsequently wrote a letter to Plaintiff's attorney defending her assessment of Plaintiff's conditions and addressing Dr. Walker's conclusions. TR 450-456. Dr. Scott J. Gale also wrote a letter to Plaintiff's attorney defending Dr. Weiss' assessment. TR 470-473.

[24]Dr. Bounds also indicated the findings that supported his assessment, but they are illegible. TR 446. Dr. Bounds indicated that "[s]ignificant change (improvement/worsening) did not occur." TR 447.

21

of Concentration, Persistence or Pace Resulting in Failure to Complete Tasks in a Timely Manner (in work settings or elsewhere)." *Id.* Dr. Hansmann's "consultant's notes" indicated that Plaintiff was "demonstrating some symptom magnification...but it is difficult to determine if it is actual malingering for secondary gain, symptoms Paranoia A, a Somatization DO or a Severe Personality DO." TR 555. Dr. Hansmann concluded that Plaintiff was experiencing "some sort of Somatization DO, learning problems, and a personality disorder (most likely with borderline, passive-aggressive, and schizoid traits) with some limitations A, B, C, D. RFC necessary."[25] *Id.*

On June 7, 2002, Dr. Rebecca Hansmann completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" form for Plaintiff. TR 544-545. Dr. Hansmann stated that Plaintiff had "[s]light" restrictions in her abilities to "[u]nderstand and remember short, simple instructions"; "[c]arry out short, simple instructions"; and "make judgements [*sic*] on simple work-related decisions." TR 544. Dr. Hansmann found that Plaintiff had "[m]arked" restrictions in her abilities to "[u]nderstand and remember detailed instructions" and "[c]arry out detailed instructions." *Id.* Dr. Hansmann also found that Plaintiff had "[m]oderate" restrictions in her abilities to "[i]nteract appropriately with supervisors(s)" and "[r]espond appropriately to changes in a routine work setting." TR 545. Dr. Hansmann determined that Plaintiff had "[m]arked" restrictions in her abilities to "[i]nteract appropriately with the public"; "[i]nteract appropriately with co-workers"; and "respond appropriately to changes in a routine work setting." *Id.*

_____

[25]The record contains a page following the "consultant's notes" which is essentially a blank page, because of the poor quality of the copy. TR 556.

## B.  Plaintiff's Testimony

At the time of her hearing, Plaintiff was 46 years old, and had at least an eleventh grade education.[26]  TR 42.

Upon examination by her attorney, Plaintiff testified that she could "read small words," but had problems reading large words.  TR 43.  Plaintiff stated that the last time that she had worked was in 1996, as a security guard with "Human Services."  TR 44.  Plaintiff reported that, she changed jobs "at least every year," and that, in the period between 1985 and 1996, she had worked as a care giver in a retirement center for about "a year, two years," and as a cashier at K-Mart.  TR 45.  She also stated that she had worked as a housekeeper during the "70's."  TR 45.

Plaintiff stated that she was 5' 5" tall, weighed 185 pounds, and that her weight went "back and forth."  TR 46.  Plaintiff reported that her weight was "about 170" pounds when she was working.  *Id.*  When asked about her financial situation, Plaintiff replied that she "still [had to] have people...help [her]."  *Id.*  Plaintiff testified that she lived alone, and prayed "most of the time."  TR 47.

Plaintiff stated that she had 6 sisters, and that she was able to "get along with them fine."  TR 47.  Plaintiff reported that she spent time with "[c]hurch people," and that she went to church every Wednesday and Sunday.  TR 47-48.  When asked about being around people, Plaintiff answered that she did "did not like being around people...[because she didn't] want people to see what [she was] going through."  TR 48.  When asked about her activities around her apartment, Plaintiff stated that some "days I can finish them."  *Id.*  Plaintiff also testified that: "I have problems with my back and some days my leg will hurt or some days my hands, I'll wake up and

---

[26] Plaintiff dropped out of high school in the twelfth grade.  TR 42.

23

my hands will be real stiff." *Id.* She noted that, "some days I just soak in Epison [*sic*] salt and take care of myself." *Id.*

When asked how standing and walking affected her back, Plaintiff stated, "Sometimes I have problems with it." TR 48. Plaintiff added, "I really don't like taking pain medication because of the side effects." *Id.* Plaintiff reported, "I try to limit some of my activities so I won't have to go through so much pain." *Id.*

Upon examination by the ALJ, Plaintiff testified that she had been living alone in an apartment for "two years, three years." TR 49. Plaintiff stated that she had a driver's license and an expired handicapped parking permit, and that she would drive to the grocery store with her niece. TR 49-50. Plaintiff reported that she would stand, walk, and sit while working as a security guard. TR 50.

Plaintiff testified that she would stand "all day" as a cashier at K-Mart. TR 52. Plaintiff stated that she had not received training for her nursing home position. *Id.* When asked what she did at the nursing home besides dispense medication, Plaintiff reported that she worked "at the desk"; "did...rounds"; assisted "[the patients] down to the breakfast room"; "lift[ed] patients"; and "help[ed] them put on their clothes." TR 52-53.

Plaintiff testified that she was not taking any medications at the time of the hearing. TR 53.

When asked whether she sought psychological help on her own, Plaintiff stated that she "didn't, if you don't have any money well, I mean, I mean I went to my primary care doctor and I told him about it." TR 54. Plaintiff also stated that "one time he did put me on some sleeping pills because I was like crying all of the time. And I couldn't control it." *Id.* Plaintiff stated that she received shots in her back, but did not "like taking [the] shots." TR 55.

24

Plaintiff reported that she could walk "pretty well" if she put on "the right equipment to walk."  TR 55.  Plaintiff testified that she could sit for 20 minutes before having to get up, however, if she would "move to the side or change positions," she could sit for 30 minutes.  TR 55-56.  When asked if she carried her groceries into her house or took out the trash, Plaintiff stated that she would "try not to...[but that she would take in] light things."  TR 56.  Plaintiff testified that she cooked her own meals, washed the dishes, did the laundry, and cleaned the apartment.  TR 57.

Plaintiff stated that she would sing as a hobby, and that she was "trying to go back and get in the choir slowly."  TR 57.  Plaintiff reported that in her spare time she would watch "television, pray for worship."  TR 57-58.  She stated, "You know, a lot of TV and programs and try to focus on positive things in life and not so much of the negative things that have been thrown at me."  *Id.*  Plaintiff testified that her condition was worse when compared to the previous year, because her "patience around people [was] not as good as it used to be."  TR 58.  Plaintiff stated that she did not have a social life.  *Id.*

Plaintiff reported that she did not smoke or drink, but drank a "cup [of coffee] a week."  TR 58-59.  Plaintiff then testified that sometimes "the folks can really get on my nerves and I can go and buy a bottle of wine and drink the whole thing."  TR 59.  Plaintiff stated that she drank one bottle of wine per month.  TR 60.  Upon re-examination by Plaintiff's attorney, Plaintiff reported that she stopped participating in the choir because she could not "buy...clothes," she "didn't have the proper things," and she "wasn't strong enough."  TR 60-61.

### C.  Medical Expert Testimony

Medical Expert ("ME"), Dr. Rebecca Hansmann, testified at Plaintiff's hearing.  TR 61-86.  With regard to the "GRP" and "MRFC" that the ALJ had provided, the ME testified that

Plaintiff had initially "alleged problems with high pain," and that Plaintiff had been "abusive with secretarial staff." TR 61. The ME stated that neurosurgeons "suggested [Plaintiff] go see psychiatrists," and that Plaintiff was "depressed or anxious." TR 61-62.

The ME noted that "Dr. McFarren suggested [Plaintiff] was highly somatic," and diagnosed her with "pain disorder...and personality disorder." TR 62. The ME testified that Dr. McFarren found that Plaintiff had a below average I.Q., and that Plaintiff's assertions that she had no psychotic symptoms did not comply with testing. *Id.* Additionally, the ME testified that Dr. McFarren found that Plaintiff's daily activities were "mildly restricted because of pain." *Id.*

The ME testified that consultative examiner Dr. O'Brien thought Plaintiff was "borderline in social functioning." TR 62. The ME further testified that Dr. Wise[27] diagnosed Plaintiff with "mixed receptive expressive language disorder, dementiae [*sic*], schizophrenia, panic disorder, with marked discrepancies in social and concentration, persistence, and adapting with decreased memory." *Id.* The ME noted that Dr. Wise found Plaintiff to have an eighth grade education, and "mild auditory and visual hallucinations." *Id.* The ME opined that Dr. Wise's diagnoses of "schizophrenia and dementia conflict" because "[y]ou either have to allow the psychosis to go one way or the other." TR 62-63.

The ME stated that Dr. Wise's diagnosis of dementia seemed "inappropriate" because "there's no evidence that suggests a dementing (Phonetic) symptom." TR 63. The ME also noted that the "diagnosis of schizophrenia [was] questionable" because of lack of evidence and her past work history. TR 64. The ME opined that if "schizophrenia did exist she would have most likely been hospitalized at some point." *Id.* The ME then stated that Dr. Wise's MPI

---

[27]It appears that "Dr. Wise" refers to Dr. Judith Weiss.

testing was "invalid," and explained that when "any of those three validity skills [*sic*] is so high you throw out the test." TR 64.

The ME testified that Plaintiff showed "symptom magnification," and explained that this "is evidence in the first psych CE of the pain disorder, which comes under a somatization disorder." TR 64. The ME noted that Plaintiff "has been generally non compliant with numerous doctors and even Social Security examiners." *Id.* The ME stated that she did not think that Plaintiff's intellectual functioning was borderline, and added that Plaintiff had a "low to average IQ." *Id.* The ME reported that Plaintiff did "appear to have significant learning deficits and possibly some type of communication disorder," in addition to "some sort of somatization disorder." *Id.* The ME testified that the "medical evidence...doesn't support the level of pain that [Plaintiff was] experiencing," but that because of her somatization disorder, "she's probably really not malingering." *Id.*

The ME further testified that Plaintiff most "likely [was] borderline, passive aggressive, and maybe schizoid in trade." TR 65. The ME stated that if "you base it on the testimony today, probably she has more problems with maintaining social functioning than she does maintaining concentration and persistence," and that, "Depending on where her pain level might be she might not concentrate as well at times as others." TR 66. The ME noted that Plaintiff was "kind of a difficult patient at times," and has "been non compliant with treatment recommendation." *Id.* The ME stated that Plaintiff "may not right now be able to interact appropriately with co-workers or respond appropriately to work pressures in a usual work setting." *Id.*

When asked what kind of improvements Plaintiff would experience with psychological counseling and medications, the ME stated that a "personality disorder [is] rather difficult to treat [and] [i]t takes a long time for things like that to improve significantly." TR 67. The ME

27

reported that if Plaintiff could "develop the insight as to understand that the pain isn't proportionate and get into some pain management and anxiety reduction she could probably improve." *Id.*

Upon examination by the ALJ, the ME testified that it looked like Plaintiff had "paranoid symptoms," but not "to the point that they're psychotic." TR 69. The ME stated that her symptoms were more like "stress reactions." *Id.* The ME added that with "just the evidence and the chart," there was "no way to assess if [Plaintiff] would interact with co-workers well or not." TR 70. The ME opined that Plaintiff had moderate social limitations, moderate limitations on concentration, and moderate "ADL." TR 70-71.

The ME testified that she "didn't see any evidence of what is considered a psychological decompensation at all." TR 71. When asked by the ALJ to compare the "evidence of record and testimony" regarding the "MRFC," the ME stated that the only difference was in the social category. *Id.* The ME opined that Plaintiff had a slight limitation in her ability to understand, remember, and carry out short and simple instructions, a moderate limitation in her ability to understand and remember detailed instructions, and a marked limitation in her ability to carry out detailed instructions. *Id.* The ME further opined that Plaintiff had a slight limitation in her "ability to make judgements [*sic*] on simple work decisions," and a marked limitation in her ability to "appropriately" interact with the public. *Id.*

Additionally, the ME stated that Plaintiff had a moderate limitation in her ability to interact "appropriately with supervisors," and, based upon the testimony, a marked limitation in her ability to interact "appropriately with co-workers." TR 71-72. The ME added that, based upon the record, however, Plaintiff had a moderate limitation in her ability to interact "appropriately with co-workers." *Id.* The ME testified that Plaintiff had a marked limitation in

28

her ability to respond "appropriately to pressures in [a] usual work setting," and a moderate limitation in her ability to "respond appropriately to changes in a routine work setting." TR 72.

The ME stated that Plaintiff's "learning disorder prevents her from developing reading and writing skills that are necessary in college." TR 72. When asked how to explain Plaintiff's low I.Q. score, the ME reported that "probably her symptoms were interfering." *Id.* With regard to her review of the record, the ME testified that she "looked over the medical notes, everything," and that she "probably spent about three, four hours on it," and then "probably spent three or four hours writing all of this up." TR 73-74.

When asked whether she had "any reason...to believe that [Plaintiff's] testimony...was somehow inconsistent with other information," the ME replied, "No. She was more cooperative with us than I expected from the record." TR 82. The ME reported that Dr. Wise[28] had administered a "broad fairly [*sic*] comprehensive test battery." *Id.* The ME testified that she disagreed with the results of Dr. O'Brien's IQ test. TR 81-85.

### D. Testimony of Tusha Bass, Plaintiff's Niece

Tusha Bass, Plaintiff's niece, also testified at the hearing. TR 86-93.

Upon examination by the ALJ, Ms. Bass testified that she would see Plaintiff twice a month for "about three to four hours." TR 87. Ms. Bass stated that she would take Plaintiff to the store, that she brought her money, and that she would take her to family and holiday functions. *Id.* Ms. Bass testified that Plaintiff had five sisters and two brothers, and that all but one lived near her, but that Plaintiff was "shut out" by her family members. TR 88.

When asked what problems Plaintiff had with her family, Ms. Bass stated that

---

[28]Again, this apparently is a reference to Dr. Judith Weiss.

29

"everybody seems to think that she doesn't have it all [and] they don't think that she's at their level." TR 88. Ms. Bass reported that Plaintiff did not "seem like a normal person [because] her reaction to things [was] different from mine." TR 89. Ms. Bass testified that Plaintiff "has a mentality of a very young person." *Id.* Ms. Bass further testified that Plaintiff had a "learning disability...a mental disability... and a physical disability." TR 89-90. Ms. Bass added, "in my mind...she's disabled." TR 90.

When asked how Plaintiff responded to unkind comments, Ms. Bass reported that Plaintiff would "snap" and that "she's been known to attack some of my Aunts when they make her mad [and] she'll get upset and cuss them out and start talking real loud." TR 90. When asked about Plaintiff's employability, Ms. Bass stated that she did not "think that she would be able to keep a job [because her] state of mind" would interfere. *Id.* Ms. Bass reported that Plaintiff received food stamps, "social services," and money from Ms. Bass herself, and she noted that Plaintiff had difficulty paying rent and utilities. TR 91. Ms. Bass added that Plaintiff had lost "about 100 pounds," "just from not having food." TR 91.

Ms. Bass stated that Plaintiff did not have a car, and that it had been four or five years since she last had one. TR 92. Ms. Bass reported that Plaintiff was "a sweet person [and that she had not] done anything wrong." *Id.* Ms. Bass stated that "when you get to know her as a person she's a nice person, a good person." TR 93.

### E. Vocational Testimony

Vocational Expert ("VE"), Jane Brenton, also testified at Plaintiff's hearing. TR 93-106. The VE classified Plaintiff's past relevant work as a security guard as light and semi-skilled, her work as a cashier as medium and unskilled, and her work as a nursing aide as medium and semi-skilled. TR 93-94.

30

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff that included the "PRFT that's been prepared by Dr. Hansmann." TR 94-95. The ALJ asked the VE whether that hypothetical claimant would be able to perform any of Plaintiff's past relevant work. TR 95. The VE answered that the hypothetical claimant "would be unable to perform any jobs." *Id.*

The ALJ then modified the hypothetical to factor in the "notations...based upon the record," and asked whether the claimant in the modified hypothetical would be able to perform any of Plaintiff's past relevant work. TR 95. The VE answered that such a claimant would be able to perform "simple one, two step jobs that did not involve working with the public." *Id.* The VE opined that there were approximately 52,000 table assembly positions in Tennessee, and "over one million" nationwide; 10,000 hand packer positions in Tennessee and 400,000 nationwide; 51,000 light janitorial or custodial work positions in Tennessee and two million nationwide; all of which would be appropriate for the hypothetical claimant. TR 95-96. The VE testified that there were also numerous other sedentary positions that would be appropriate for the hypothetical claimant, including 4,800 table assembly positions, 3,200 hand packer positions, and 3,000 wrapper positions. TR 96.

Plaintiff's attorney then questioned the VE. TR 99. Plaintiff's attorney asked the VE to compare the number of jobs available for the ALJ's second hypothetical claimant to the number of jobs available for a new hypothetical claimant "who's 45 years old, who's illiterate, who has a history of unskilled past relevant work who exertionally is capable of sedentary work and who has no other limitations." *Id.* The VE responded that the occupational bases would be "pretty similar." TR 100.

31

### III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  If the Commissioner did not consider the record as a whole, however, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence:

Case 3:03-cv-00679   Document 34   Filed 04/18/06   Page 32 of 45 PageID #: 34

(1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience. *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B. Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied. 42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

> (1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
>
> (2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
>
> (3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[29] or its equivalent. If a listing is met or equaled, benefits are owing without further inquiry.

---

[29]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. §§ 404.1520, 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and

34

nonsevere. *See* 42 U.S.C. § 423(d)(2)(B).

### C. Plaintiff's Statement Of Errors

As an initial matter, Plaintiff in this action is proceeding *pro se*. The law is well established that the Court has a duty to liberally construe *pro se* complaints. *See, e.g., Boag v. MacDougall*, 454 U.S. 364 (1982).

Plaintiff essentially contends that the ALJ's decision was incorrect because he failed to consider new and material evidence. Docket Entry Nos. 18; 24; 25. Plaintiff also contends that her impairments prevent her from being able to perform a significant number of jobs. Docket Entry No. 23. Accordingly, the Court will construe Plaintiff's argument as a claim that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed and remanded. *Id.* Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking." *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits. *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

Case 3:03-cv-00679   Document 34   Filed 04/18/06   Page 35 of 45 PageID #: 37

**1.  New and Material Evidence**

Plaintiff argues that she has "proof that document [*sic*] in this case were not included when [the] final decision was made in this case."  Docket Entry Nos. 18; 24; 25.  Plaintiff has attached those documents to her "Motion for Judgement [*sic*] / Attorney's Reconsideration" (Docket Entry No. 18), her "Motion to Present Facts" (Docket Entry No. 24), and her "Motion to Present Facts in My Case" (Docket Entry No. 25).  Plaintiff essentially contends that these documents constitute new and material evidence, and that the Appeals Council must accept review of the ALJ's decision when new and material evidence is submitted.  *Id.*  Plaintiff further maintains that remand is warranted to consider the new evidence submitted to the District Court. *Id.*

Plaintiff's newly submitted documents demonstrate the following:

Plaintiff was treated by Dr. Richard Pinson in the emergency room on January 16, 1995, for complaints of "lower back pain–(L) side through (L) cheek into knee."  Docket Entry No. 18.  There was no "numbness," but there was "sharp pain."  *Id.*  Dr. Pinson's impression was "back strain."  *Id.*

Plaintiff underwent a CT scan of her lumbar spine on January 30, 1995.  Docket Entry No. 24.  Upon examination, the physician noted that Plaintiff suffered from a "Backache."[30]  *Id.*  Dr. Scott Allen read the CT scan, which showed "Hypertronic changes in the facets at all levels but predominately at L2-3 and L3-4."  *Id.*  Plaintiff's CT scan also revealed, "Hypertrophy of the ligamentum flavum at L3-4 with very mild spinal stenosis at this level," "Diffuse disc bulges at all imaged levels but greater at L2-3 and L3-4," and "Central to slightly left paracentral mild disc

---

[30]The physician's name is illegible.

36

herniation at L3-4 which compresses the thecal sac." *Id.* Dr. Allen observed, "Neural foramina are generally narrowed but nerve roots appear intact," and "The L3 nerve roots are intact." *Id.*

On February 13, 1995, Plaintiff was seen by the physician who had seen her January 30, 1995.[31] Docket Entry No. 24. The doctor noted that Plaintiff suffered from "backache." *Id.* He recommended continuing Roboxin and Naprosin, and seeing an orthopaedist. *Id.*

Plaintiff was seen by the same physician on March 28, 1995, for complaints of "back pain" and being "unable to sit for more than 15 minutes at a time."[32] Docket Entry No. 24.

On August 2, 1995, Plaintiff was examined by Dr. L.P. Laughlin for complaints of "pain in the low back and left leg," resulting from an injury that she sustained the prior January while working at K-Mart. Docket Entry No. 24. Dr. Laughlin assessed Plaintiff as having "back strain" and "no evidence of radiculopathy," and he prescribed "weight reduction, hot soaks," and "flexion exercises." *Id.*

On September 7, 1995, Plaintiff was seen again by Dr. Laughlin, who reported that Plaintiff was "still having discomfort in her legs." Docket Entry No. 24. Dr. Laughlin noted, "The flexion exercises bother [Plaintiff]." *Id.* Dr. Laughlin prescribed Valium, and recommended an MRI of her back. *Id.*

On September 8, 1995, Plaintiff underwent an MRI of her lumbar spine, without contrast. Docket Entry No. 24. The MRI found "left lateral HNP, L4-5," and "Degenerative disc disease L5-S1 without HNP." *Id.*

On September 14, 1995, Plaintiff was seen again by Dr. Laughlin, who reported that "she

---

[31]The physician's name is illegible.

[32]The rest of this record is illegible.

37

may be a little bit better but she is still having back and left leg pain and the exercises hurt her."
Docket Entry No. 24. Dr. Laughlin reviewed Plaintiff's MRI, and noted that "there is no
question that she has changes at the 4-5 level, definite bulge, looks like the anulus is torn and it
looks like however [*sic*] the nerve root is escaping." *Id*. Dr. Laughlin recommended a second
opinion to determine whether "an operation is in order." *Id*.

On September 29, 1995, Plaintiff underwent x-rays, an "AP" of her pelvis, a CT scan of
her lumbar spine, and a lumbar spine series. Docket Entry No. 24. The x-rays revealed "mild
loss of height involving the L5 vertebral body with mild concave deformity of the superior and
inferior L5 endplates." *Id*. The "AP" of her pelvis was a "normal study." *Id*. The CT scan
revealed an "L4-5 moderate diffuse posterior disc bulge with bilateral facet hypertrophy
resulting in mild bilateral foraminal stenosis," an "L3-4 minimal diffuse posterior disc bulge,
eccentric to the left," and " no evidence of lumbar disc herniation or spinal stenosis." *Id*.

On October 6, 1995, Plaintiff underwent a lumbar myelogram and a CT scan of her
lumbar spine, which were read by Dr. Daniel Starnes. Docket Entry No. 24. The Myelogram
revealed "Diminished filling of the left L5 nerve root sleeve at the L4 disc level." *Id*. The CT
scan revealed a "Left ward bulging of the L4 disc."[33] *Id*.

Plaintiff also submitted a copy of the May 6, 1996, deposition of her physician, Dr.
Weiss, that was taken when Plaintiff sued the K-Mart Corporation that year. Docket Entry No.
24. In that deposition, Dr. Weiss testified that he had been treating Plaintiff since1995, and that
he had diagnosed Plaintiff with a "disc herniation protrusion at L4-5." *Id*. Dr. Weiss agreed that

---

[33]While these tests were not included in the original record, Dr. Weiss does discuss them
in an office note dated October 6, 1995, which was included in the record and referenced by the
ALJ. TR 16, 510-511.

the "ruptured disk" was "compatible and consistent and the likely result and consequence" of her injury at K-Mart. *Id.* Dr. Weiss stated that he did not feel that surgery "would help her," stating that surgery "would remove something pinching a nerve," but "would not relieve 100 percent of her pain." *Id.* He stated that he did not feel that Plaintiff would "appreciate" surgery that did not completely remove her pain. *Id.* Dr. Weiss noted that Plaintiff had "reached maximum medical improvement" on October 6, 1995. *Id.* Dr. Weiss opined that Plaintiff retained "7 percent" "residual permanent partial impairment," and that she needed a "lifting restriction of 25 pounds, the avoidance of repetitive bending or stooping and no maintenance of a single posture for a prolonged period of time." *Id.* Dr. Weiss agreed that these restrictions were "likely to be permanent." *Id.* Dr. Weiss noted that Plaintiff's weight was a "problem, but not one that I addressed per se." *Id.* Dr. Weiss further agreed that it would be to Plaintiff's "benefit" if she were to "drop off about 50 pounds," but reiterated that "the principal problem here was the disk disease." *Id.* Dr. Weiss also agreed that Plaintiff "would be better off working than sitting at home." *Id.* Dr. Weiss stated that he had treated Plaintiff with Lortab, Tylenol 3, and Motrin. *Id.*

Plaintiff was treated by Dr. Joseph A. Wieck on March 30, 1995, for complaints of "back pain that radiates into her left leg, but not below her knee," and "numbness in her hand, but not in either leg." Docket Entry No. 24. Upon examination, Dr. Wieck noted that Plaintiff had "full range of motion in her L-S spine and she [had] no hard muscle spasms." *Id.* He noted that the CT scan showed "some minimally bulging disks, which are essentially normal." *Id.* Dr. Wieck prescribed anti-inflamatory medicine, heat, exercises, and physical therapy. *Id.* He also "discussed the importance of weight control and aerobic condition." *Id.*

Case 3:03-cv-00679   Document 34   Filed 04/18/06   Page 39 of 45 PageID #: 41

Plaintiff was examined by a physician on November 15, 2000.[34]  Docket Entry No. 24.

The doctor diagnosed Plaintiff with "Cervical Pain and radiculopathy/Low Back Pain," and

recommended "Physical Therapy, Evaluation, and Treatment."  *Id.*

Plaintiff was seen by Dr. T.J. Humbridge on September 11, 2003.  Docket Entry No. 18.

Dr. Humbridge diagnosed Plaintiff with "Lumbar radiculopathy," and a "nodule [illegible]."[35]

*Id.*

In addition to the medical evidence discussed above, Plaintiff also submitted several

other medical documents, including an April 29, 1997, office note from Dr. Melvin Law (TR

514-515), a consultative psychological examination by Dr. James McFerrin dated June 23, 1997

(TR 474-479), an emergency room report dated January 16, 1995 (TR 483-485), a letter by Dr.

Robert Weiss dated September 27, 1995 (TR 351), an office note by Dr. Weiss dated October 2,

1995 (TR 350), an office note by Dr. Weiss dated October 6, 1995 (TR 510-511), an independent

medical evaluation by Dr. E.I. Howell, Jr., dated February 17, 1997 (TR 512-513), and a Medical

Source Statement to do Work Related Activities by Dr. W.A. Griner, dated August 23, 1996 (TR

480-482).  Docket Entry Nos. 18; 24.  While Plaintiff contends that these document had been

"deleted or removed" from the record by "prior attorneys," and that these documents "were not

included when [the] final decision was made in this case," these documents *are* present in the

record,[36] and the ALJ referenced many of them directly.  *See* TR 16-17.

Plaintiff also submitted documents including letters and forms from Metropolitan Social

_____

[34]The doctor's signature is illegible.

[35]The rest of this diagnosis is illegible.

[36]The Court has parenthetically noted the pages in the record where each of these documents can be found.

Services, food stamp requests, insurance forms, "assistance in obtaining consultative examinations" forms, attorney letters, Dr. Robert Weiss' curriculum vitae, work letters from her employment at Goodwill Industries, a Tennessee student competency report, reports from her time at Cohn Adult learning center, workers' compensation letters, an employer's first report of work injury, housing information, and briefs from her lawsuit, *Carolyn A. Campbell v. K-Mart Corporation*, No. 95-4046-III. *See* Docket Entry Nos. 18; 24; 25.

The regulations provide that where new and material evidence is submitted with the request for review, the entire record will be evaluated and review granted where the Appeals Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence. 20 C.F.R. § 416.1470. There is no evidence in the present record that Plaintiff submitted this "new" evidence to the Appeals council for review. Instead, Plaintiff attached this "new evidence" to her "Motion for Judgement [*sic*]/Attorney and reconsideration" (filed on February 3, 2004), and to her Motions "to Present Facts" (filed on April 22 and 30, 2004). *See* Docket Entry Nos. 18, 24, 25.

Remand for consideration of new and material evidence is appropriate only when the claimant shows that: (1) new material evidence is available; *and* (2) there is good cause for the failure to incorporate such evidence into the prior proceeding. *Willis v. Secretary*, 727 F.2d 551, 554 (6th Cir. 1984). Plaintiff can show neither.

As an initial matter, Plaintiff cannot establish that the medical records and other information that she now submits are material. "In order for the claimant to satisfy her burden of proof as to materiality, she must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988) (*citing Carroll v.*

*Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)). Plaintiff has failed to satisfy this burden. Plaintiff argues that this evidence is "new and material," and thus is necessary to fully develop the record. But the medical evidence now submitted is neither "new" nor "material" because the great majority of the information provided was dated between 1995 and 1997 (before the alleged onset date of October 31, 2000) or was already interpreted and explained in doctors' reports contained in the record. Moreover, as will be discussed in greater detail below, Plaintiff has failed to demonstrate "good cause" for why this information from 1995 through 1997 was not previously included in her records.

Additionally, none of these documents contradicts or adds to the conclusions that physicians have reached in the record. The record in the case at bar is replete with doctors' evaluations, medical assessments, test results, and the like, all of which constitute "substantial evidence" to support the conclusion reached.

As explained above, the ALJ's decision must be supported by "substantial evidence." "Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion" (*Her*, 203 F.3d at 389 (*citing Richardson*, 402 U.S. at 401)), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance" (*Bell*, 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229)).

Even if Plaintiff's medical records that she now submits had been part of the record before the ALJ, Plaintiff cannot demonstrate that there is a reasonable probability that he would have reached a different disposition of the disability claim if presented with that evidence. The ALJ's decision demonstrates that he carefully considered the testimony of Plaintiff, Plaintiff's niece, Tusha Bass, Medical Expert, Rebecca Hansmann, and Vocational Expert, Jane Brenton. He observed Plaintiff during her hearing, assessed the medical records, and reached a reasoned

42

decision.

Moreover, as has been noted, Plaintiff has not established "good cause" for failing to submit these records to the ALJ during the hearing. Plaintiff argues that this evidence was not available at the hearing because the records were "deleted or removed by prior attorneys," and "not included when [the] final decision was made in this case." Docket Entry No. 24. Plaintiff's argument, however, is unconvincing. First, more than half of Plaintiff's "new" documents were not "deleted or removed" from the record, but were present and considered by the ALJ. In his decision, the ALJ refers to the fact that Plaintiff "never underwent recommended surgery, had no treatment whatsoever in 1996, and has had very little back impairment in the past several years. See exhibits B24F, B25F, and B26F." TR 16. Each of the ALJ's cited exhibits is included by Plaintiff as "deleted or removed" evidence from the record, yet it clearly was not removed or deleted. *See* Docket Entry No. 24.

Second, Plaintiff testified at the hearing that her record was complete. TR 53-54. During the hearing, the ALJ specifically asked Plaintiff, "do we have all of your medical records?" TR 53. Plaintiff responded, "I'm hoping you have all of them. Is there some that I should provide to you?" *Id*. The ALJ then stated, "Well, that's what I'm asking you. You don't know of anything else that pertinent [*sic*]. Very well." TR 53-54. Plaintiff agreed at the hearing that there was nothing that was not in the record. Therefore, Plaintiff cannot now argue that there was missing evidence.

Plaintiff has failed to demonstrate either that the now submitted evidence was either new or material, or that there was good cause for her failure to present the new evidence at the administrative hearing. Accordingly, remand is not warranted.

43

**2.  Ability to Perform a Significant Number of Jobs**

Plaintiff also argues that she believes that she cannot perform a significant number of jobs, and therefore, that the ALJ erred by stating that she could perform a significant number of jobs.  Docket Entry No. 23.

As has been noted, the record in the case at bar is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ, and all of which constitute "substantial evidence."  Additionally, the ALJ's decision demonstrates that he carefully considered the testimony of Plaintiff, Plaintiff's niece, the ME, and the VE.  While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's determination that there are a significant number of jobs in the national economy that Plaintiff can perform.  TR 26.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387.  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273).  The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

### IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's "Motion for Judgement [*sic*]" be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it

44

with the District Court.  Any party opposing said objections shall have ten (10) days from receipt

of any objections filed in which to file any responses to said objections.  Failure to file specific

objections within ten (10) days of receipt of this Report and Recommendation can constitute a

waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466,

88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge
